# JULY TERM, 1848.

NOLLEY, ET AL, vs. CALLAWAY COUNTY COURT.

1. The securities of a public officer, are only responsible for his performance of the duties assigned him by law; and if the officer engage, or those who by law have the control of his official conduct, employ him in matters foreign to his office, the securities will not be bound for his acts while so employed.

2. The law concerning school funds, requiring the clerk of the county court to keep the bonds for the loan of such funds, and the county court to renew bonds and to pass upon the sufficiency of the bonds, if by an order, or by permission of the court these duties devolve upon the treasurer, and any loss happen thereby, his securities will not be liable.

3. If the court permit the treasurer to use the funds as a loan, and any loss happen, his securities will not be liable.

4. The settlements made by an officer with a court, are not conclusive against his securities, but may be explained or disproved by them.

5. The refusal of a county treasurer to pay a warrant drawn upon the treasury, is presumed to be based upon the want of funds in the treasury.

6. The declaration of the treasurer assigning the want of funds as the reason for not paying the warrant, are not admissible. His declarations assigning other reasons for his refusal would be admissible to rebut this presumption.

7. An officer will not be presumed to have applied the public funds to his private purposes, and hence as a general rule in an action in which the official conduct of an officer is in question, his pecuniary embarrassments would not be competent evidence; but where it has been shewn that those having the right to control his acts have permitted him to use such funds, his pecuniary embarrassments are competent as a link in the chain of evidence establishing the defence of the securities.

## APPEAL from Callaway Circuit Court.

ANSELL & KIRTLEY, *for Appellants*.

1st. The testimony offered of Nolley's embarrassed and broken condition in 1839–40–41, and up to the execution of the bond sued on, was legal, competent and pregnant proof to establish the main issue in the cause that the defaults of Nolley, if any, were committed anterior, and not subsequent to the bond. There is ample proof given to show a prior commingling of the public

29

and private funds by Nolley; at least, the jury had sufficient to warrant them in so finding—that being so—his being frequently dunned—his inability to pay small demands so repeatedly made on him, both for public and private funds—his continual efforts to borrow, were the usual and ordinary fruits and evidence of an exhausted treasury. See 8 Mo. Reps., Todd, et al, vs. Boone County, p. 431; 1 Star. 56, 57.

2nd. The reasons stated by Nolley for failing to pay out school funds when warrants were presented, were a part of the *res gesta* not obnoxious to the principle that a party shall not make evidence for himself, and ought to have been given in evidence, as a statement accompanying the official act. 1 Starkie, 63; 9 Mo. R. 623–4, Gamble vs. Johnson; 1 Greenleaf, 123–4–5–6, sec. 108, 109, 110.

3rd. The statement offered by Daniel Tucker, as collector of the revenue of 1839 & 40, that he would deliver to Nolley the receipts that should have been given to the tax payers, for which Nolley would receipt to witness as money paid in the treasury, was legal evidence conducing to prove the commingling of the public and private funds as early as 1839–40; and also that the funds purporting to be in the treasury, as evidenced by Nolley's receipts, were not in fact there. 8 Mo. R. 431, Todd, et al, vs. Boone County.

4th. The first instruction was not the law, and should have been overruled.

5th. The second and third instructions of plaintiffs ought not to have been given. The settlements on their face were irregular, and not according to the provisions of the statutes regulating the treasury, and so much so, that the jury were not bound to give them the faith and credit due *prima facia* evidence that stands unrebutted. 1st Starkie, 479, side paging, 7th Amer. ed.; 6th Amer. ed. 479.

6th. Plaintiff's fifth instruction ought not to have been given under the operations of the order of the county court of the 8th of March, 1838, placing the school funds entirely under the disposal of Nolley. 7 John. R. 332, People vs. Janson; 1 Howard's R. 257, U. S. vs. Eckford's Ex'rs.; 8 Mo. R. 396, Draffin vs. Boonville; U. S. vs. Farren & Brown, 5 Peters' R. 389.

7th. Under the order of the 8th March, 1838, and the manner in which the county court transacted the business with the treasurer, the neglect and failure of Nolley to pay warrants drawn on him, was some evidence that the funds not applicable to such warrants were not in the treasury; and the sixth instruction should have been refused.

8th. The order of the 8th of March, 1838, was in effect and operation, and in all its consequences, a loan of the school funds to Nolley, so treated and construed by the county court and Nolley, as evidenced by the whole course of settlements from 1838 to the last settlement in October of 1842; and therefore the plaintiff's 7th instruction ought to have been refused. Theobald's Principal and Security, p. 43, and 83, 84, 85, 90, 91, 92; U. S. vs. Patterson, 7 Cranch, 572; Miller vs. Stewart, 7 Whea. 680; U. S. vs. Kirkpatrick, 5 Cow. R. 733; 3 Saund. R. 412.

9th. The plaintiff's eighth instruction ought not to have been given under the operation of the order above mentioned. The county court made their settlements with Nolley after the manner of their own prescribing, and Nolley's securities cannot be held responsible for its irregularity. Authorities as above.

10th. The impropriety of plaintiff's ninth instruction results from the principles above insisted on.

11th. The plaintiff's tenth instruction is a restatement of the second instruction; and the twelfth instruction is similar to the fifth.

12th. The defendant's eighth instruction was well asked, applied well to the case, and is well sustained by authority. 1st Howard's Rep. 262, United States vs. Eckford's executors.

13th. Defendant's thirteenth instruction refused by the Circuit Court, we insist was clear law, applicable to the case, and sustained by these authorities.

14th. The defendant's fourteenth instruction is warranted by all the proof in the cause, and sustained by the following authorities: 9 Wheaton, 680, Miller vs. Stewart; do. do. 729, U. S. vs. Kirkpatrick.

15th. Defendant's fifteenth instruction is in strict accordance with the provisions of the statute regulating the treasury, and ought to have been given. Statute Mo. 1838–9, page from 118 to 122, and sec. 48, 8; Statute 1835, page 564, sec. 11.

16th. The defendants twentieth, twenty-first, twenty-second, twenty-third, and twenty-fourth instructions, contain the correct law, are applicable to the case, and ought each of them to have been given to the jury. Statute 1835, p. 562–3–4–5, secs. 2, 3, 8, 9, 10, 11, 12, 13, 16; do. 1838, –'39, p. 118–19–20–21–22, secs. 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 25, 30, 38, 39 and 48.

17th. And finally, we insist, that the Circuit Court committed error in overruling defendant's motion for a new trial.

Leonard, *for Appellee.*

First. That the settlements with the county court are conclusive against Nolley and his securities, and both he and they are estopped from denying their truth. Baker, Treasurer of the Commonwealth, vs. Preston and others, 1 Virginia Reports, 235; 1 Greenleaf's Ev., sec. 27, sec. 207; Devoll vs. Leadbetter, 4 Pick. Rep. 220.

Second. Nolley's insolvency and inability to pay his debts when applied to for that purpose, is no evidence that there was no money in the treasury, and all the evidence of his pecuniary embarrassments, and of his borrowing small sums to pay debts, offered on the ground that if the public money had been in his hands as treasurer, he would have applied it to his private debts, was properly excluded.

Third. Nolley's declarations that there was no money in the treasury, given to those who presented warrants for payment as the reason for not paying, is no evidence in his favor of the fact which he states.

Fourth. The evidence offered through the witness Tucker, of the manner in which Nolley received the county revenue in 1839 and 1840, was wholly irrelevant to the case, as all of the balance now claimed on account of the county revenue went into the county treasury subsequent to the settlement of November, 1841.

Fifth. The court properly instructed the jury on the part of the plaintiff.

Sixth. The defendant's refused instructions were properly rejected.

These instructions, even if correct and unobjectionable as abstract propositions, were irrelevant to the issue, and as their admission ought not to have influenced the jury in their decision of the issue presented to them, so their exclusion did not prejudice the defendants. The plaintiff put her right of recovery on the ground that the money she sought to recover was in the treasurer's hands during his last official term; and the court directed the jury that if the money were there, the plaintiff was entitled to recover, but if it were not there, they must find for the defendants.

Napton, J., *delivered the opinion of the Court.*

This was a suit upon the official bond of Daniel Nolley and his securities, as Treasurer of Callaway county, for an alleged default. The plea of the defendants was *non est factum,* and under this it was agreed that the plaintiff might give in evidence any matter showing a right of recovery on the bond, and the defendants any matter constituting a legal defence.

The plaintiff obtained a verdict for $7,167 46, which the court refused to set aside, and the defendants appealed.

On the trial, the plaintiff gave the following evidence:

1. The appointment and official bond of Nolley as Treasurer, of the 24th February, 1842—his resignation on the 26th October, 1842, and the appointment of Henderson as his successor on the 2nd December, 1842.

2. Nolley's official settlements of the 28th October, 1842, showing first, the following balances due the several Townships, on account of the school fund:

| | | | |
|---|---|---|---|
| T. 47, R. 8, | .................................. | $252 | 83 |
| T. 49, R. 9, | .................................. | 000 | 00 |
| T. 48, R. 7, | .................................. | 371 | 63 |
| T. 47, R. 7, | .................................. | 334 | 52 |
| T. 49, R. 10, | .................................. | 344 | 21 |
| T. 45, R. 11, | .................................. | 000 | 00 |
| T. 45, R. 9, | .................................. | 000 | 55 |
| T. 46, R. 9, | .................................. | 284 | 54 |
| T. 44, R. 11, | .................................. | 613 | 71 |
| T. 46, R. 11, | .................................. | 6 | 37 |
| T. 48, R. 8, | .................................. | 238 | 54 |
| T. 47, R. 10, | .................................. | 109 | 74 |
| T. 48, R. 10, | .................................. | 7 | 22 |
| T. 46, R. 10, | .................................. | 499 | 28 |
| T. 48, R. 9, | .................................. | 646 | 67 |
| T. 44, R. 10, | .................................. | 379 | 85 |
| T. 47, R. 9, | .................................. | 1,228 | 04 |
| | | | |
| Balance due School Fund, | ........................ | 5,319 | 70 |
| Balance due County Revenue, | .................... | 321 | 82 |
| Balance due Road and Canal Fund, | .............. | 72 | 04 |
| | | | |
| | | 5,713 | 56 |
| Interest to 1st of March, 1847—4 years 3 months, | | 1,556 | 56 |
| | | | |
| | | 7,270 | 12 |
| Second, a balance due the Road and Canal Fund of | | 341 | 90 |

3. Nolley's official settlement of 21st December, 1842, in relation to the county revenue showing a balance due that fund of $201 82.

The plaintiff also proved that on 25th August, 1842, Thomas Ritchie paid into the county treasury $120 00, on account of county revenue,

which was not charged against Nolley in his settlement of December, 1842. That Nolley was applied to by his successor for the books and papers of the office, and that he delivered over the treasury books, but no money or evidences of debt. That afterwards in February, 1842, Nolley's successor received from him a warrant previously drawn on the road and canal fund for $268 86, and credited it against the balance due that fund, leaving a balance still due that fund of $72 04.

The defendants then gave in evidence—

1. Nolley's annual appointments as county treasurer from the 22d May, 1833, to the 15th March, 1841, both inclusive, with the several official bonds given on these occasions.

2. His quarterly settlements in relation to the county revenue from the 21st August, 1833, to the 1st April, 1842, both inclusive. The settlement of the 25th November, 1841, showed that the treasurer was then in advance to the county $1,944 59, and the settlement of the 1st April, 1842, showed a balance against him of $212 10.

3. His annual settlement in relation to the school funds from the 22nd March, 1837, to the 19th April, 1842, both inclusive.

On the 20th August, 1835, the county court settled with the commissioner, under the law as it then was, and upon that settlement there appeared to be due the several townships, $2,659 57 in money, and $12,055 63 1-2 in bonds. These amounts of money and bonds were handed over to the court, and by the court were deposited in the county treasury and the treasurer's receipt taken therefor.

*On the 5th September,* 1835, it was ordered that Daniel Nolley, County Treasurer, be appointed to receive the interest due upon all bonds now in his hands upon deposit to the several congressional townships in this county on account of school funds of said townships, and to renew such notes as are due upon receiving the interest as aforesaid, and upon his taking bonds and mortgages with such security as he deems good under the provisions of the late law on that subject, and that he report to the court his acts under this order at the next term.

On the 22nd March, 1837, the court made a settlement with the treasurer (Nolley,) on account of school funds belonging to the several townships, and found him chargeable as follows :

| T. 48, R. 9, | Principal, | $1,731 66 |
|---|---|---|
| | Interest, | 138 82 |
| T, 47, R. 9, | Principal, | 4,514 40 1-2 |
| | Interest, | 263 71 |

|  | | |
|---|---|---|
| T. 46, R. 10, | Principal, | 1,717 78 1-4 |
| | Interest, | 108 43 |

and so on, with the remaining townships.   On the 6th and 7th March, 1838, another settlement of a similar character was made with Nolley. A single township will be sufficient to show the mode in which the settlement was made.  "The court this day made settlement with D. N., &c., on account of the school fund belonging to C. T., 47. R. 9, and find said treasurer was chargeable on settlement made with the court on the 22d March, 1837, with the sum of $4,514 30, principal, and $263 71 interest, then due and unpaid up to the 27th February, 1837, and the sum of $406 28, interest due on the above principal up to this date, amounting in the whole to to the sum cf $5,184 29 ; and that he has paid out in the same time to the several school districts in said township on warrants, the sum of $407 90, the vouchers for which have been examined by the court, found correct and destroyed, leaving a balance in the hands of the said Nolley of $4,776 39, which the clerk will charge him *with.*"

*On the 8th March,* 1838, the county court made the following order .— "It is ordered by the court that in settling with Daniel Nolley, county treasurer, of his accounts, on account of the school funds belonging to this county in his hands, that the interest arising upon said funds be calculated against him at the rate of nine per cent. per annum, and that the additional one per cent. be considered as his compensation for services and loss on said fund in loaning and taking bonds, &c."

On the 23d February, 1839, the court made a settlement with Daniel Nolley on account of the school fund.  The mode of calculating what was due one township will be sufficient to show the principles upon which the settlement was based.   The court found in relation to C. T., 47, R. 9, that there was charged to Nolley on settlement of March 6, 1838, the sum of $4,776 39, and that he had paid out on warrants the sum of $379, leaving a balance of principal due said township of $4,397 39, and $395 73 interest due and unpaid up to 6th March, 1839, making a balance due the said township of $4,792 12.

On the 20th March 1840, another settlement was made with Nolley on account of the school fund.   In this settlement it appeared (as the record states,) that Nolley was chargeable on his settlement made 23d February 1839, with the sum of $4,792 12, (on account of T. 47, R. 9,) principal and interest, and has paid out in the same time the sum of $400 70, upon warrants, leaving a balance of principal then due of $4,392 42, and the sum of $395 31 interest, due and unpaid up to the 6th March, 1840, amounting in the whole to the sum of $4,787 73.

On the 9th March, 1841, another settlement was shown, by which it appeared that Nolley was charged with $4,787 73, (on account of T. 47, R. 9,) as found by the settlement of March 20, 1840, that he had paid since said settlement $387 40, upon warrants, leaving a balance of $4,-400 33 principal, and $396 02 interest, due and unpaid on the 6th March> 1841, amounting in the whole to $4,796 35.

On the 19th April, 1842, the county court had another settlement with Nolley in relation to the school fund, calculated on the same principles as the foregoing, and on the 28th October, 1842, was the final settlement given in evidence by the plaintiff.

4. Nolley's settlements in relation to the road and canal fund of 23d March, 1837, 9th March, 1841, and 30th April, 1842. The last settlement showed a balance of 1,550 52, at its date, against Nolley. The interest was calculated at nine per cent, as in the case of the school fund.

The defendant also introduced sundry witnesses, who testified as to the manner in which the treasury of Callaway county was managed.

*Grant,* the clerk of the county court, testified that he had been clerk since August, 1836, and that he had examined the records of the county court, and that the orders and settlements given in evidence were *all* relating to the subject; that there were no orders on record showing that loans were made by the county court to borrowers of any sums of money out of the road and canal fund, or the township school funds, and that no order for any such loans had ever been made by the court to individual borrowers since January, 1836.

During the period of witness' holding the clerkship up to the date of Nolley's resignation, no note for any sum loaned by the court or any person for them has ever been deposited with the clerk of the county court. He recollected of but one instance, at which time Smart was a county court justice, that the notes for the loan of the funds were exhibited in court by the treasurer, and they were exhibited on settlement on that one occasion, but were not deposited in court or with the clerk, but were retained by the treasurer; that in the files of the county court there is not any receipt filed, given by the treasurer for any money paid out by him to borrowers of either of said funds, nor was there any receipt filed given by him for the payments of any principal, nor any of the payments of annual or other interest due to the treasury by any borrower or payers of any notes for either of said funds at any time since the first appointment of the said Nolley as treasurer. With regard to the county revenue received and paid since the 24th February, 1842, to the

day of Nolley's resignation, an account was kept in his (witness') office and by this account Nolley was guided in his final settlement of this fund. This witness further stated that Nolley had been since 1836, and previ-ously, engaged in merchandize in Fulton, with different partners ; that the books, papers and money belonging to the treasury were kept in a safe in the counting room of the store. Witness often called for money due the county, and frequently left funds of his own, and occasionally borrowed from the firm, and the public monies and funds of the firm were kept in the same box, promiscuously.

At the times of Nolley's several settlements, there never was any exhibit of cash in court, nor were commissioners appointed to examine the county funds, nor any receipt taken by the court of the treasurer for any amount passing over from one term to another.

Several other witnesses testified as to the mode in which Nolley's private and public business was conducted, substantially the same as Grant.

*Jones* testified that in 1841, he got a warrant for school funds on the treasurer; that he presented it several times, but finally took Nolley's individual note for it. The witness was asked what reason Nolley gave for not paying it when presented, but this was excluded and an exception taken. Witness was then asked whether Nolley paid this individual note which he had given for the warrant, but this question was objected to and the court excluded it.

Witness proceeded to state that he had loaned money to Nolley and other members of the firm before that time, and defendant's counsel offered to prove by this witness and others that from 1840, to February, 1842, Nolley was much embarrassed in his private affairs, that he was unable to meet his liabilities, borrowing money where he could get it, and frequently in small sums. This evidence was excluded and an exception taken.

Several witnesses stated that they had warrants on the school fund and always found difficulty in getting them *immediately*—some of them taking goods out of the store and others taking orders on individuals.

*King* stated that he was collector of Callaway for the years 1841 and 1842; that he had a settlement with Nolley on the 19th Feb. 1842, as treasurer, in relation to the revenue he collected in 1841, and took Nolley's receipt for $2,028 11; that when collecting the revenue for 1841, individuals frequently requested him to call on Nolley for their taxes; that Nolley would in such cases give him a written statement, sometimes signed by him as treasurer, and sometimes as an individual, that he would pay the taxes named therein, and Nolley afterwards took in these

statements as so much money. The amount so assumed by Nolley in the year 1841, was about $1,303 04. In the settlement with Nolley, no money was actually paid; the settlement was made up of these written agreements of Nolley, and some individual debts due from him to said King.

The plaintiff then gave the following evidence in reply:

1. An order of the county court of Sept. 1842, appointing Messrs. Basket and Sitton commissioners to aid Nolley in making his settlement.

2. The testimony of these gentlemen, who stated that Nolley made out the settlements substantially as they have been given in evidence; that they went over the calculations with Nolley, examined the bonds and notes on hand, and calculated the interest due upon them; that on the settlement, Nolley was charged with the balances due on the last preceding settlement, and with 9 per cent. interest thereon, and credited with all the bonds and notes he produced, good and bad, and with the interest apparently due upon them, calculated at ten per cent. and compounded annually.

The plaintiff asked sixteen instructions, all of which the court gave, except the 14th and 16th, which are as follows:

1st. In this case, if the bond sued on was executed by all the defendants, the jury must find a verdict against all of them or none.

2nd. The settlements of 1842, given in evidence in chief by the plaintiff, are evidence against both Nolley and his securities, that the balances of money therein stated to be due and belonging to the county, were in Nolley's hands as treasurer at the respective times of the settlements, and upon this evidence the jury ought to find for the plaintiff, unless the defendants have shown to the satisfaction of the jury that these balances were not at the respective times of the settlements, or at any time during Nolley's last official bond in his hands as treasurer, or unless these balances have, since said settlements, been paid over to the county.

3rd. It is the duty of the defendants to prove to the satisfaction of the jury that the balances exhibited in the settlements of 1842, given in evidence in chief by the plaintiff, were not in Nolley's hands as treasurer at any time during the last bond, or if they were, that they have since and before the commencement of this suit, been paid over to the plaintiff.

4th. It was the duty of the defendant after his resignation in 1842, and the appointment of his successor, immediately after he had notice of such appointment, to pay over to his successor the balances in his hands belonging to the county, and if he failed to do so, the jury ought to allow the plaintiff interest upon such balances at six per cent. per annum

from the time he ought to have paid the same over, down to the present time.

5th. The treasurer had no right to apply the school funds to the payment of warrants drawn on the county treasury, or upon the road and canal fund, nor had he any right to apply the school funds of the township to the payment of warrants drawn upon the funds of another township; but it was his duty to pay the warrants drawn upon him out of the funds upon which they were drawn, and which were appropriated by law to that purpose.

6th. The neglect or refusal of Nolley to pay any warrant drawn upon him as treasurer, is no evidence that funds not applicable by law to the payment of such warrants, and which funds ought to have been in the treasury, were not in fact there.

7th. The order of the county court of the 8th of March, 1838, given in evidence by the defendants, does not constitute a loan of the money of the county by the county court to Nolley, nor is there any evidence that the funds of the county were loaned to Nolley.

8th. It was the duty of Nolley, as treasurer, to make correct settlements of his accounts as treasurer, and his securities were bound for him that he should make such settlements.

9th. The alleged misconduct of the county court in not counting the money of the county, or in allowing Nolley to loan out the school funds, or in neglecting to take receipts from the treasurer for money paid into the treasury, does not discharge or release Nolley or his official securities for official misconduct, for which he or they were otherwise responsible: but each set of officers are liable for their own misconduct.

10th. The settlements of 1842 given in evidence by the plaintiff, are evidence against Nolley and his securities, that the balances of money therein stated to be due and belonging to the county, were in his hands as treasurer at the several times, and that the jury are bound to find a verdict for the plaintiff against all the defendants for such balances, unless the defendants have shown to their satisfaction that they were not then, or at any time during his last term of service in his hands, as treasurer, or unless they have been since paid over to his successor in office.

11. The settlement of October, 1842, given in evidence by the plaintiff, is conclusive evidence against Nolley and his securities, that the balances therein stated as belonging to the county, were in his hands as treasurer as therein stated, and that Nolley and his securities are estopped by the settlement from denying the same, unless there were fraud or mistake in the settlement.

12. The treasurer had no right to apply the school funds to the payment of warrants drawn on the county revenue, or upon the road and canal fund, but was bound to pay the warrants drawn upon him out of the several funds upon which they were drawn.

13th. In this case the jury must find their verdict against all the defendants or against none of them.

14th. The several settlements given in evidence are conclusive against Nolley and his official sureties for the time being, that the balances therein stated to be due and belonging to the county, were in the hands of Nolley as county treasurer as stated in the settlement, and that neither Nolley nor his securities for the time being, can deny that said balances were so in his hands, although they may show by evidence that said balances were subsequently withdrawn from the county treasury, or misapplied.

15. It was the duty of the defendant, after his resignation in 1842, and the appointment of his successor, immediately to pay over to his successor the balances in his hands belonging to the county, if he failed to do so, the jury ought to allow the plaintiff interest on such balances at the rate of six per cent. per annum from such time, down to the time of finding their verdict.

16. The jury will disregard all the parol evidence given in the cause, so far as the same proves, or conduces to prove, that there was not in the hands of Nolley, as county treasurer, the balances stated in the settlement of October, 1842, as therein stated.

The defendants asked twenty-four instructions, all of which were given, except the 8th, 13th, 14th, 15th, 16th, 20th, 21st, 22nd, 23rd, and 24th; they are as follows, to wit:

1st. To entitle the plaintiff to recover in this action, she must prove to the satisfaction of the jury that the defendant, Daniel Nolley, was guilty of some default or official misconduct after the execution of the bond sued on. In the absence of such proof, the jury ought to find their verdict for the defendants.

2nd. The present defendants, securities of Daniel Nolley, are only liable for some default or official misconduct of the defendant Nolley, occurring after they executed the bond on their part, while the former securities are liable for defaults or official misconduct occurring during the time they were bound as said Nolley's securities.

3rd. The present defendants, securities as aforesaid, are not liable in this action as Nolley's securities for money received by him prior to the execution of their bond, unless the jury are satisfied from the evidence

that the money so received was in the county treasury at the time the present defendants executed their bond, or at some subsequent period prior to said Nolley's resignation of the office of treasurer.

4th. It was the duty of the county treasurer to receive the funds of the county in money, keep them separate and apart from his own funds, and pay them out when lawfully required so to do; and if he failed to do so during the time of his prior appointments, his former securities are liable for such omission and default.

5th. It was the duty of the county court to settle annually with the treasurer, and also to settle with him upon his resignation; and if by reason of the neglect of the court to do so, it is difficult or impossible to find the amount of the treasurer's default, or the time when it occurred, the present securities are not to be prejudiced by such omission.

6th. It was the duty of the plaintiff in the present action, not only to prove an official default on the part of the treasurer, but also that such default occurred during the time of the present securities.

7th. Although the accounts of the treasurer with the county court, showing money in the county treasury, may be *prima facie* evidence of such money being in the treasury, yet it is competent for the defendants to show that in fact such money was not in the treasury; and if from such evidence the jury believe that it was not in the treasury, they are bound so to find, notwithstanding the accounts may show to the contrary.

8th. The plaintiff must show the amount of the defalcation of the treasurer during the term for which the defendants were sureties, to charge them, and this is not done on the face of the general transaction, it is necessary therefore to have a re-statement of the accounts for this purpose; this re-statement does not falsify the general account, but arranges the items of debits and credits, so as to exhibit the transactions of the treasurer during the time covered by the bond in question.

9th. The sureties are only bound for the misapplication of the public money during the term of the appointment for which their bond is given, and the extent of this responsibility must be shown by the plaintiff: the official terms are as distinct and separate in regard to the sureties, as if different persons had served in each of them.

10th. That the legal responsibilities of the sureties are not, and cannot be affected by the mode of keeping the accounts between the treasurer and the county court; if liable, the sureties are made so by their contracts, and the plaintiff being made a party to that contract, cannot by any action of the county court or its officer, the clerk, change its legal or equitable effect.

11th. The contract of the surety is to be construed strictly, and not to be extended beyond the fair scope of its terms; and the county court cannot by any exercise of their discretion, enlarge or restrict the obligation of the treasurer's bond, so as to bind the sureties by creating new and additional obligations.

12th. The funds currently received and paid over in one term, and belonging to that term, cannot be appropriated in discharge of a defalcation that accrued before the sureties were bound, and by such appropriation hold the sureties liable for the amount.

13th. If Daniel Nolley was permitted by the county court to loan or dispose of the road and canal funds of the county, otherwise than by paying them out on the warrants drawn by the order of the county court, and any losses or default in said fund accrued from said permission, then the securities of said Nolley are not responsible in this suit for such losses or default.

14th. If the jury find from the evidence, that by the consent of the Callaway county court, Daniel Nolley was permitted for several years previous to and from the 24th of February, 1842, until his resignation, to have the possession and control of all the bonds given for the school funds, to renew said bonds from time to time, with the makers thereof, said Nolley agreeing to take the risk of losses on said bonds, then the defendants in this suit, who are securities of said Nolley on the bond sued on, are not chargeable with any default or deficit on said funds, that were the consequences of such arrangement between said Nolley and the Callaway county court.

15th. The securities of Daniel Nolley, defendants in this suit, cannot by law be charged with any interest on moneys belonging to the county while remaining in the county treasury.

16th. The jury have the power to find a verdict against Nolley, the principal obligor, and a verdict in favor of the defendants who are sureties.

17th. That the settlement of the county court ascertaining balances due from the defendant Nolley, in his previous terms of service to that in which the defendants are sued as sureties, are not as to those sureties conclusive evidence that such balances were actually due, or that such balances were in money actually in the treasury.

18th. That if during those former periods of service, the treasurer misconducted himself by receipting for sums as of money paid in, which were not money, such misconduct is chargeable to the former sureties,

and the present sureties are only responsible on balances due for moneys paid in and being in the treasury when their liability commenced.

19th. The settlements made in 1842, given in evidence by the plaintiff, are not conclusive evidence of the moneys received from the preceding treasurer, or during the term of the present bond sued on, but are only presumptive evidence of such facts, and each charge may be disproved by facts and circumstances, and by parol proof.

20th. If the jury find that any of the balances charged against Nolley, the treasurer, from year to year, since Feb. 9th, 1839, upon the road and canal fund, and the township school funds, and charged against the defendants, arises from any default of the treasurer, other than in safe-keeping the moneys received from the State treasury, or paid in by debtors upon loans specially made to borrowers by order of the county court, or for interest paid in by such borrowers, these defendants are not responsible.

21st. If the jury find that any default arises from the loss of the funds of the kind aforesaid, or either of them, which the court authorized the treasurer, Nolley, to loan at his own discretion, and charged at any time during his several terms, these defendants are not responsible for any such losses.

22nd. If the jury find that any of the balances on settlement aforesaid, arises from interest charged upon balances supposed to be in the treasury, and unappropriated by order of court, in loans or other appropriations by court, these defendants are not responsible for any such deficits.

23rd. If the jury find that any of said balances arise from compounding interest upon interest, supposed to be in the treasury, or in the hands of the treasurer, to be used at his discretion, and without specific loans made by the court, such balances are not chargeable against these defendants.

24th. These defendants are not chargeable for any funds in the treasury, except such as were received from the State or from debtors under loans made specifically to borrowers, by the county court, or for interest paid in by such debtors; and only for a default in paying over to the successor of the treasurer, of the amount of such deficits in actual money, at the date of the defendant's bond, or for money received after its date from the State treasury, on those funds, or money paid in by borrowers, of loans actually made by the court, as principal, or the interest thereon, during the term specified in the bonds sued on.

The principal controversy in this case has arisen out of the alledged default in relation to the school fund. The balances due the road and

canal fund, and the county revenue, according to the plaintiff's own exhibit, amounted to less than four hundred dollars, exclusive of interest, and the remainder of the verdict, ($7,167 46,) must have been for the deficits in the school fund. We shall therefore confine our observations entirely to this branch of the case, assuming, that there can be no dispute about the liability of the defendants for the defalcations in the county revenue and the road and canal fund.

To this end, it will be proper, first, to ascertain the law which governed the management of this fund, during the period of Nolley's last official term.

In 1831, the Legislature of this State authorized the sale of the township school lands. Commissioners were appointed to make the sales, and to loan out the money arising therefrom, at an interest not exceeding ten, nor less than six per cent. The commissioners were permitted to take personal security for sums under one hundred dollars, and required to take mortgages on real estate to secure all sums over that amount. The notes were directed to be made payable to the commissioner, and his successor in office, for the use of the inhabitants of the township to which the fund belonged; and the interest was ordered to be paid over to the township trustees, or such other persons as the county court might direct.

In 1833, the Legislature authorized sales on credit. In 1835, material changes were made in the system. The office of commissioner was abolished, and his principal duties were transferred to the county court. The sheriff of the county was selected to superintend the sales, and the commissioners in the several counties were directed to hand over the bonds in their possession to the county court, and make a full settlement of their accounts with that tribunal, and the court was directed to deposit the bonds with the county treasurer.

The court was thereafter to loan out the moneys arising from sales of school lands, as the commissioner had before done, and was entrusted with the duty of determining the sufficiency of the securities offered, and seeing from time to time that no loss was likely to happen through their insufficiency. A change in the form of the bonds was also made. They were to be drawn payable to the county, for the use of the inhabitants of the township, and the interest was to be paid annually into the county treasury. The compensation of the treasurer was limited by the act of 1835 to one-half of one per cent, upon all moneys received and paid out by him.

The act of February 9th, 1839, was still more specific in detailing the

duties of the several officers who were entrusted with the management of the school fund. The duty of loaning the money was still reposed in the county court; but a further provision was made that interest, when not punctually paid, should become principal. This court was directed, from time to time, to examine the bonds and mortgages and inform them-. selves of the sufficiency of the securities, and require additional security when necessary. The interest and the principal (when paid) was directed to be paid into the county treasury, and the treasurer was required to give duplicate receipts, one of which was to be delivered to the clerk of the county court to be filed in his office. The clerk was directed, upon the filing of such receipt, to charge the treasurer with the amount.

The court was entrusted with summary modes of proceeding in order to enforce the collection without delay of moneys due upon these bonds and mortgages. They were directed to require the clerk to keep and state all accounts with the treasurer relative to the township school funds, and the clerk was ordered to receive and file all bonds and mortgages relating to this fund.

The treasurer's duty was specifically defined: it was to *keep all moneys paid into the treasury* on account of the township school funds; to *pay all warrants* drawn upon such fund; to exhibit to the county court such reports and accounts concerning these funds as that court should direct, and keep accounts of all receipts and expenditures arising out of this fund. This was the law at the time the bond was executed upon which this suit was brought.

It will not be denied, as a general principle, that the securities of a public officer, whose duties are defined by law, are only responsible for the faithful performance of the duties so assigned to him, and cannot be made liable for malversation in the conduct of affairs which do not pertain to the office. The reason is obvious enough: it is not so "nominated in the bond." The securities do not bind themselves to become responsible for any but *official* misconduct, and if the officer voluntarily engages, or be employed by another body who by law have a control over his official conduct, in matters entirely foreign to the business of his office, any losses which may happen in the transaction or management of such business cannot be visited upon those who have guarantied the *official* conduct of the officer. Hence, it was held by this court, (Blair vs. Perp. Ins. Co., 10 Mo. R.) that if a corporation employ a clerk in the transaction of business in which the law prohibited the corporation from engaging, the securities of such clerk were not responsible for any losses or

defaults happening through the mismanagement of the clerk in the business thus illegally entrusted to him.

The securities are presumed to have an eye to the law which defines the duties of the officer, when they enter into an engagement with reference to the performance of those duties; and to hold them responsible for the performance of other duties than those assigned to him by law, however the risks of loss or the liabilities of, mistake might be increased or varied, would be a palpable violation of the letter and spirit of the contract.

What, then, was the duty of the treasurer from the 24th of February, 1842, to the 26th October of the same year, in relation to the school funds? It was too keep all moneys paid into the treasury on account of this fund; to pay all warrants drawn upon this fund; to exhibit to the county court such reports and accounts as might explain its condition, and to keep accurate accounts of receipts and disbursements. These duties are essentially different from the duty of keeping the bonds; they are essentially different from the business of renewing the old bonds, or taking the new ones and passing upon the sufficiency of the proffered securities. They are still more at variance with a responsibility for the entire amount of the school fund, principal and interest, running from year to year at a compound interest of nine per cent. The duty of keeping the bonds, in 1842, belonged to the clerk of the county court; the duty of taking new bonds and passing upon the sufficiency of the securities, either upon the old or new bonds, was entrusted by law to the court.

We do not wish to be understood as intimating that the responsibility of the treasurer would be diminished or affected by a failure on the part of the court or clerk to perform their respective duties. We only design to maintain the position that, if the court assigns duties to the treasurer which the law requires the court to perform, the securities of the treasurer are not liable for any failure in the performance of such duties.

It will be necessary to examine the records of the county court, as presented by the bill of exceptions and the oral testimony given on the trial, for the purpose of ascertaining the value of the official settlement of Nolley on the 28th of October, 1843, as evidence of the amount of the school fund which passed through his hands during the term for which the present defendants became responsible. That settlement was admitted in evidence on the part of the plaintiff, and, no doubt, very properly: for, although it was not completed until the 28th of October, and Nolley's resignation had been handed in on the 26th, it may be considered

30

as official. A successor was not appointed until the 2nd of December following. We do not consider such settlements as conclusive, as seems to have been held by the tribunal which decided the case of the Commonwealth vs. Preston and others, (1 Vir. R., 235.) It was open to explanation, and for this purpose the defendants introduced all the settlements from the time the school fund was taken from the control of the commissioner until Nolley's resignation of his office of treasurer. These annual settlements, taken in connection with the order of the county court of the 8th March, 1838, and the testimony of the clerk, will explain the *basis* upon which the final settlement of October 28th, 1842, was founded. This order of the 8th of March directed that Nolley should be charged with nine per cent. interest on account of the school fund, and that one per cent. should be allowed him for services and *loss* in loaning and taking bonds. The testimony of the clerk is, that from the date of the order, and, indeed, for some time previous thereto, until the close of Nolley's official term, the county court never took any new bonds or loaned out any portion of the school fund paid in upon personal or landed security; that they never examined the bonds which had been taken, or new ones taken by Nolley, (if there were any such;) that no bonds were ever deposited with the clerk, nor any receipts given for interest or principal paid into the treasury, deposited with the clerk, nor any account kept by the clerk of amounts so paid into the treasury. If we take these statements of the clerk, this order of the court, and the annual settlements which appear on the record, what must be the conclusion as to their tendency to explain the character of the final settlement on the 28th October? What other inference can be drawn from the whole transaction than that the whole school fund was in plain terms *loaned* to the treasurer, at a compound annual interest of nine per cent., to be managed at his discretion? The control of the court was withdrawn—the official check of the clerk, who by law was directed to be the depository of the bonds, and to keep an account of the moneys paid into the treasury on account of this fund, no longer existed. Nolley, in fact, became the court, the clerk and treasurer, so far as the school fund was concerned. How different must be the responsibilities of his securities, if we hold that Nolley's discharge of all these duties, some of which by law devolved upon other officers, was secured by his bond as treasurer. In 1835, upwards of $14,000, in bonds and mortgages and money, were placed in Nolley's hands. In 1842, the account current between Nolley and the county court showed an amount exceeding $20,000 due—$6,000 of which could not be accounted for. Had the county court performed

its duty, and required the clerk to perform the duty assigned to him, it could scarcely have happened that so large an amount would have passed through the treasury in any one year. It will be readily seen, that if the duties of the court and clerk can be imposed upon the treasurer, and his official securities be held responsible for his faithful discharge of those duties, they in fact become liable, not for his official conduct as treasurer, but *as endorsers* for a loan of the whole school fund.

In order to show how far the settlement of October 28th, 1842, would tend to establish the amount of money belonging to the school fund which actually was paid into the treasury during that year, from the 24th February until the 26th October, let us glance at the successive settlements from 1837 to the date of this final settlement. It will only be necessary to refer to the settlement in reference to a single township, as the calculation for all the townships are based upon the same principles. In March, 1837, the court charged Nolley, on account of township 47, range 9, with the sum of $4,514 40½ principal, and $263 71 interest. In March, 1838, Nolley was charged, on account of this township, with $5,184 29, being the amount of principal and interest found due on the former settlement, and nine per cent. interest on that amount up to the date of this settlement. From this, was deducted the amount which Nolley had paid out on warrants drawn upon this fund, which left a balance in his hands of $4,776 39. In 1839, the court charged Nolley with the amount so found in 1838, and after deducting the amount he had paid out on warrants, found a balance due of $4,397 39, and charged him nine per cent. interest on this to the date of the settlement—making the amount he was debited with, $4,792 12. In 1840, the same course was pursued, and Nolley's indebtedness on account of this township was found to be $4,787 73.— In 1841, the calculation, proceeding on the same basis, makes the amount of indebtedness $4,796 35. In April, 1842, the amount of indebtedness on account of this township was $4,800 20. On the final settlement in October, 1842, (given in evidence by the plaintiff,) the court assumed the previous settlement in April as the basis of their calculation, and accordingly charged him with $4,800 20, and $240 interest, making $5,040 20, which, after deducting the amount of the bonds, leaves a deficit of $1,228 04. Now, what tendency has this settlement, we mean the final one, to explain the amount of money, either principal or interest, which had been paid to the treasurer on account of township 47, range 9, during the year 1842? *Prima facie*, and without explanation, it would seem to show that $4,800 of the principal and $240 interest had been paid since the previous settlement, and that, inasmuch as he could show bonds

only to the amount of $3,812 16, there was a deficit against him of $1,228 04. But the previous settlements show that this was not the fact —that this $4,800, or thereabouts, had been due by Nolley to this fund for years before; and it does not appear that a single cent was paid into the treasury during the year 1842 on account of this fund. The settlement, then, proves nothing. We do not mean that it was not originally properly admitted in evidence, but when the whole transaction, of which it forms a part, was brought to light and explained, its value in proving the fact it was designed to establish is annihilated.

If it be said that by invalidating the effect of the official settlement of October, 1842, we leave the plaintiff without the means of proving the actual amount of money which came to the hands of the treasurer during the term for which the defendants became responsible, our answer is, that the loss which happens through such defects of testimony will justly fall upon those whose agents have brought about such a state of things.

The law which regulates the management of this fund is plain enough. Had the treasurer given receipts for all sums paid into the treasury on account of this fund, as the law directed, and one of them been deposited with the clerk, and the clerk charged the treasurer with such sums, the condition of the fund would have always been easily ascertained.— The amount received and the amount paid out in any given year could be readily shown. If the treasurer neglected to perform any of his duties, the records of the clerk's office would at once detect his errors or omissions. This was no doubt the policy of the law in requiring duplicate receipts, and in requiring the clerk to file the receipts and keep the b nds. One officer was designed to check the other, as the auditor of public accounts is constituted a check upon the State treasurer. But as this system, so judiciously prescribed by law, was not observed in Callaway county, she cannot complain if embarrassments grow out of a failure on the part of her public agents. At least the losses occasioned by such a course of conduct cannot with any propriety be visited upon those who have never agreed to be responsible therefor.

Whatever may have been the course of the county court, and however much they may have departed from the duty prescribed by law, there is no doubt that the treasurer and his securities are still responsible for whatever moneys may have been paid into the treasury on account of the school fund during the term and not accounted for at its expiration. But the plaintiff must show the amount by some legal evidence. The instructions given by the court evidently point the jury to the settlement of October 28th, 1842, as a leading and controlling document from which they

could infer the losses actually happening during the year 1842, and which would be properly chargeable to the present defendants. These instructions should have been withheld, and the instructions asked by the defendant, based upon the hypothesis which we have supposed the evidence had a tendency to establish, should have been given.

One or two questions in relation to the admissibility of evidence offered by the defendants, have been discussed at the bar, which we will now briefly notice.

It was proved that Nolley, on several occasions, refused or failed to pay warrants presented to him; and it was proposed to prove further that, upon these occasions, he gave as a reason for not paying, that there was no money in the treasury. These declarations of Nolley were excluded. It is contended that they were admissible as a part of the *res gestæ.* It is exceedingly difficult, if not impracticable, to settle upon any general principle which will determine in every class of cases the competency or incompetency of declarations offered as a part of the *res gestæ.* If we resort to authority, we find that adjudications and commentaries conflict; if we seek for the principle upon which the doctrine rests, we find it will not adapt itself to every class of cases and every variety of circumstances. If it be the law, that every declaration which forms a part of the *res gestæ,* is competent, provided the *res gestæ* itself be admissible in evidence, the only question to be decided in a given case, would be whether the declaration offered could properly be considered a part of the *res gestæ* or not. This opinion has been maintained by several learned commentators on the law of evidence, and it is possible that it may eventually prevail with the courts. The inclination of judicial tribunals tends more and more every day to relieve themselves of questions of this character, and let the evidence, along with the objections, go to the jury. But this principle, whatever may be its merits, has not received any general sanction, although a solitary case may be found to favor it. In the case of Turner vs. Belden, adm'r. of Pulliam, (9 Mo. R. 797,) it was held by this court, that declarations made by the possessor of personal or real property, although made during the continuance of the possession, could not be admitted to strengthen or enlarge the title which that possession would of itself imply. Declarations in disparagement of the title, it was conceded, might be admitted, because they tend to rebut the inference which the possession implied, and were against the interest of the party making them. Whatever may be the propriety of this opinion, and there was certainly an abundance of adjudged cases to sustain it, it would not do to carry the principle into

every class of cases, in which declarations accompanying the *res gestæ* are offered in evidence. There is a class of cases in which I am inclined to think manifest injustice would be done by the adoption of such a principle as was decided in Turner vs. Belden, and which must therefore constitute an exception to the rule.

If a man be charged with some misconduct or crime, his acts at the time, and immediately subsequent upon the commission of the alledged offence, might be very material, and would certainly be competent to relieve him from the charge, and it would be hard to exclude his declarations explanatory of his acts, although they might favor his defence.— A man, for example, is entrusted with a package of money, which he fails to deliver according to the directions of the owner, and he is sued for the amount. His defence is, that he was robbed. His conduct at the time of the alledged robbery, in searching for the package, in putting the officers of justice on the look-out—his apparent or real concern at the time of the loss, would certainly be evidence in his favor. Would not letters written by him, or declarations made at the time of the alledged robbery, giving an account of the circumstances attending the robbery, be also admissible? (Tompkins vs. Saltmarsh, 14 Serg. & Rawle, 275.) It would seem that the principle determined in Turner vs. Belden cannot be safely adopted in every class of cases. But I am unable to perceive any thing in the circumstances of the case now under consideration, to distinguish it *in principle* from the case of Turner vs. Belden, or bring it within any of the exceptions just alluded to.

Nolley's refusal or failure to pay off the warrants presented to him, was of itself evidence that there was no money to meet such demands— because the presumption is, that a public officer will do his duty. Had Nolley, at the time the warrants were presented, placed his refusal to pay them on other grounds, such as their informality or illegality, his declarations to this effect would clearly have been admissible; because they would tend to rebut that presumption which his refusal to pay would legally imply. His declarations that there was no money in the treasury to meet the demands, would only confirm the presumption already raised by his acts—and being in his own favor—upon the principle decided in Turner vs. Belden, should be excluded.

The testimony in relation to Nolley's pecuniary embarrassments, would be clearly illegal upon general principles, and under ordinary circumstances. A public officer would not be presumed to apply public moneys to meet personal liabilities. His embarrassed condition as an individual, would therefore generally have no tendency to prove his misapplication

of the public funds. There is no necessary connexion between the facts. But when the public officer is shown to have mingled promiscuously his own money with the money of the public, and to have been in the constant practice of meeting demands against the public funds in his hands with his individual effects, and *vice versa* to have paid off private debts with the public moneys, the presumption with which the officer is ordinarily favored is destroyed. These facts being established, his pecuniary embarrassments form a link in the same chain of testimony, and should have been admitted.

The other Judges concurring, the judgment is reversed and the cause remanded.

Scott, J. I concur in reversing the judgment, and the main principles of the opinion, but dissent from the review of the case of Turner vs. Belden.